May it please the Court, I'm Jim Bisno. I'm attorney for Louis Villegas, the petitioner and appellant here. And I've noticed that there's some celebrity cases going on in our city. Jackson, Blake, Specter. And one thing these cases all have in common is all these guys fired their lawyers. In fact, they fired a number of lawyers. And so suppose, hypothetically, today, lawyer number one calls up Michael Jackson and says, Michael, I think you ought to have a court trial, or, Michael, I think you should go on self-defense, or I think your attorney ought to file 995. Well, Michael Jackson would be saying, you know, I fired you three lawyers ago. I have no duty to depend on you. You have nothing to do with my case. And I think he'd be right. I think it would be unreasonable to think otherwise. And yet, in the evidentiary hearing in this case, it was the testimony of the discharged lawyer that seemed to be material and convincing not only to the superior court, but to the magistrate and the district court. Now the first lawyer, Mr. Dougherty, he testified that he never he that he did not tell your client that the life without the possibility of parole was a mandatory I think it was Dougherty who testified he did. No, I'm looking at it. And he said that he didn't say, he says, was that mandatory? This is the questioning. Where did you tell him the penalty would be, life without the possibility of parole? Was that mandatory or discretionary with the court? Mandatory. I didn't think it was discretionary at the time. Okay. And did you convey that to Mr. Villegas? I don't think it was ever discussed. Well, then I'll go with that, Your Honor. Well, this is your case. He should be going with that. Judge Milton, the superior court judge, made a finding that he said it was mandatory. But how do you analyze that under AEDPA? I would. It makes a finding that's clearly contradicted by the underlying testimony. I think it's an unreasonable determination in light of the evidence. And I also think that it's a – the State decision rests on an unreasonable evidentiary foundation based on faulty – a defective and faulty fact-finding process, as the circuit said in Taylor v. Maddox. And to me, what this case is about is that the court of appeal basically asked the defendant to testify and to prove to the defendant that it was mandatory. And we're finding that the State offered 15 to life. We just want you to find one thing. Would he have accepted the 15 to life if he knew that life without parole was mandatory? Or would – did he have an unswavering or a desire to – an unswerving desire to go to trial, no matter what? And it really had to do with Mr. Villegas' thought processes. This was a young man. He was 18 years old. He was not present at the scene of the murder. He did not know that there was a – that there was going to be a killing. He did not intend that there was going to be a killing. He had no record. He didn't get along with Mr. Daugherty, lawyer number one, because Daugherty never came and visited him in Wayside, where he was housed, for a year before his mom got the money to hire a lawyer. And the – The whole notion about concession is probably not something of an easy task for judge  But detective Tallman, who apparently had already pursued the case in other countries because he questioned the direction to the superior court. Was that consistent of the prejudice prong? Well, in the respect that – He said – they said, determined whether or not he would have accepted the deal. Or – or whether he would have – or whether he was going to go to trial in any case. Yes. And I think that that is – Was that burden too high? For – for who? I'm not sure I understand. Well, why did he have to show – isn't the test reasonably probable that he would have accepted the deal instead of finding that he would have? Yes. I see what the court is saying. And probably it was stated in a – in too high a burden for the petitioner. But you didn't argue that, did you? I didn't argue that. Why not? Frankly, I thought – I didn't think it was necessary. I thought that the – Do you think it's appropriate for us to decide the case based on the facts or unreasonable determination of the facts? In the light of the proceeding under the D2 prong, yes. Well, is that – since the standard, the constitutional standard is a question of law, don't we have the discretion to consider that issue whether – you know, if we decide to, because it's a question of law, not a fact, even though you didn't argue it? Are you saying – can you look back and say that the California court of appeal, in its order to the superior court, was itself an unreasonable order? I would say – Well, an unreasonable application of Strickland's prejudice. Yes. Yes. The court – Strickland talks in terms of is it reasonably probable. Yes. And I think the court could do that if it wants to look at the court of appeal ruling, yes. I think that one thing that – and I think this is clear from what the jury foreman said in the excerpts of record, it's – because it's clear from my client's statements to the police and the whole way that played out is that he is an 18-year-old follower, not the leader, not a sophisticated person. He's exactly the person who had a right to depend on the last lawyer. And I think he did, and I think that's where it – there was an ineffectiveness here, a prejudicial ineffectiveness, and this Court should send this case back, reverse the district court, and allow him to – order the prosecution to give him the 15-year life offer that it made. Thank you. Thank you, counsel. You may please report. Robert C. Schneider, Deputy Attorney General for Respondent Appeal. Mr. Dorgy told Mr. Villegas that the sentence would be life without possibility of parole. Whether or not he used the word mandatory in the discussion that followed obviously was totally irrelevant. Why was that so irrelevant? Because Mr. Villegas was not the least bit interested in hearing about that sentence. He wanted to get out. How can you say that? How can you say that? Because he told the court, and he told the trial court in a letter that I thought I should be getting a suspended sentence, and that was his position all along. He was not interested in discussing. That is why there was a falling out between Mr. Dorgy and Mr. Villegas. But if he had been told it was mandatory, doesn't that make a difference? It makes a difference to somebody who is going to listen to reason and listen to his attorney, but Mr. Villegas was not going to listen to his reason or listen to an attorney. That's why he got upset with Mr. Dorgy. Mr. Dorgy testified, as soon as I told him the facts in this case, our relationship disintegrated. He didn't want to hear the facts. Why would hearing one more fact make any difference? Well, I suppose that that's a pretty serious fact, whether your sentence is going to be mandatory versus something that's within the discretion of the trial court judge. But if you're going to be acquitted, why would you take, if you believe you're going to be acquitted because this was merely an accident and you were only in the wrong place at the wrong time, why would you accept 15 to life? Let's assume that Dougherty, he didn't talk about mandatory, but he said life without possibility of parole, and Mr. Villegas just didn't listen to him. He gets the new lawyer, Mr. Moses. Mr. Moses thinks he operates, he advises the client the entire time and does the trial thinking that the sentence was not going to be mandatory. He did the entire pretrial and trial thinking he was going to get the man acquitted. And Mr. Villegas wanted to walk free. He wasn't thinking about being convicted. If he thought about being convicted, he took responsibility for his actions, he would have taken 15 to life and run with it. He wanted to be acquitted. Every court said that he had deficient assistance of counsel. He was deficient. Every court has said that. But it was prejudicial. No, that's the correct solution. This Court is not prejudicial because Mr. Villegas was not interested in hearing about sentences he was interested in hearing about, a suspended sentence or acquittal. Mr. Dougherty gave him the facts. He didn't want to hear it. Mr. Moses may very well in his deficiency give him hope, but the hope was only feeding what Mr. Villegas was interested in beginning with. Acquit me. Let me have a suspended sentence. Mandatory 25 to life, 15 to life, same to me. Is that the same to you? That's 10 years longer mandatory prison sentence. It meant no difference to him. Mr. Villegas thought he was not culpable. The prejudice, that's where the prejudice comes down. You could have told him mandatory is mandatory. He was interested. His mindset was I was just an accident, wrong place, wrong time. I want to be acquitted. If that's his mindset, then this Court has to find that it's an unreasonable find that he would have decided no. My mindset is I want to acquittal, but oh, the word mandatory. Oh, now I change. That's unreasonable. He would not have changed. That's where the Court found law. He thought whoever his own mental process might be, which is not the rest of the question, he thought he was going to get acquitted at the very least of the suspended sentence, the very most of the suspended sentence. Why would the word mandatory suddenly fall into this? And if no one says that that word wasn't discussed, Mr. Moses, after a great deal of prodding, finally admitted, incredible person that he was, that he did discuss it. He probably would have discussed it. He always discussed important issues with his clients. But he didn't know. He also testified he didn't know that the law changed. He would have pulled out the sentence. That L was obviously there. No, but he didn't know that it was mandatory. As though mandatory would make any difference. Mandatory, of course. That word would have had nothing, no impact on Mr. Villegas, who was not in a listening mode. He was not using his listening ears, as they say to children. He wanted to quit it. Mr. Villegas could have heard the word mandatory all day long. I want to quit it. Even after he's convicted, he's telling a trial judge, I want a joint suspended. That's what I was going to take. Even then, he was looking at a suspended sentence. That's what puzzles me about your argument, is that you're saying he wanted a suspended sentence, that, of course, that's an impossibility. Of course. Because he wasn't speaking the reason. No one told him that. No one told him that. He was listening. He thought he had he was not culpable. Under his own vision of the world, which he has a right to have, is wrong. But his wrong vision of the world, his wrong personal moral values about his culpability, which led him to believe he should have a suspended sentence, can't inform this Court other than on the issue of prejudice. Was this particular man prejudiced? Would anything that anybody said to him make any difference? No. Is that unreasonable for him as an individual? Of course. But he's a gangster and a robber and a murderer. He has a very different lifestyle than people who are reasonable. He, in his mind, it was just an accident. Just an accident. Wrong place, wrong time. That didn't change. And no one says he didn't hear 15 delights. Everybody says that. But he still thinks he should have got a suspended sentence. Is that reasonable? Of course not. That's irrelevant to our discussion. Getting back to the question I asked counsel, did the State court of appeal give the proper direction to the superior? I think the State court of appeal sent it back to examine the prejudice fraud. What did they say? You know, I'm sorry, Your Honor. I don't have the exact quote of the order here. I apologize. Wasn't it to determine whether he would have accepted it? That may have been the language. Well, that was it or wasn't the language. I'm sorry. I can't quote that. It was the language, wasn't it? It was. He didn't use the term. The court didn't use the term reasonably probable. No. If you've read that. Isn't that the prejudice standard under Strickland? That is. I don't know if the court intended to set a standard, though. What would you do if you were a superior court judge? I would do what this judge found and went through and found that, in fact, he did not and would not have, which is not that he probably would have. Nothing in the discussion by the superior court that he was looking, he was asked to determine whether or not it was reasonably probable. But his findings were that he would not have. Well, is reasonably probable the same as would have? I think so. It is? I think that he is. You don't see any difference in the standard? I think that the judge in this case found that based upon Mr. Gagas's background, his view of this, he would not have accepted the sentence. And that, I guess, is a factual finding that he would historically go back in time. He would not have changed his decision. And that, I think, is more than reasonably probable. It's not a reasonable probability. But you think that imposed too high of a burden on Mr. Gagas? I don't think that the court, that the superior court was even thinking about what the order was. What's an objective versus a subjective standard? The subjective. What he would have done is relates to him. Reasonable probability is what a reasonable person would do. I don't think there's a reasonable person standard in a prejudice decision, because it's based very much on the individual. A reasonable person would have taken 15 life and run with it. Mr. Gagas wasn't reasonable. That's not the standard. We can't have prejudice based upon an unreasonable defendant. This was the third attorney. He was not a cooperative individual. But he would not have accepted it. When the court made a factual finding that because of his view of his own culpability, regardless of what was given to him, he would have rejected the people's offer, that was a finding, a fact, that he would have not, not that he probably wouldn't have not, would have accepted it. It was an absolute fact finding based upon historical view of what would have happened, not what might have happened. But I don't think that the superior court was thinking about what the Court of Appeals sent it back with. It did not without reading the order. Sometimes I've seen that, where they actually look at the order and say, of course, the appeal said this, and here the court was making factual findings. He would not have made a difference. Regardless of what the Court of Appeals may have said in his remand order, in this case, this Court, sitting as an evidentiary hearing officer, made a factual finding, he would not have made anything different. Was Mr. Gigas reasonable? No. But he was aware of the possibility, and any nuances of that possibility, mandatory or not, would have had absolutely no impact on his decision that he was not culpable. He would not have listened to anyone telling him the contrary, including after he was convicted. His mind was made up, unchanged by the facts, unchanged by the law, unchanged by the advice of three attorneys, and by an overcovered jury of his peers. Any other questions? Thank you. Thank you very much, counsel. Gigas v. Yearwood is submitted for decision. U.S. v. Berrigan is also submitted for decision.
judges: Hall, Wardlaw, Paez